## THE PHOENICIA.

(District Court, S. D. New York. October 24, 1898.)

CARGO DAMAGE—LEAKY PORT—CONTACT WITH STONE SLUICEWAYS AT HAVRE—MISFITTING BLIND—CONFLICTING EVIDENCE—BURDEN OF PROOF—PROPER INSPECTION NOT PROVED—UNSEAWORTHINESS.

The new steamer P. on her first voyage from Hamburg to New York, when in mid-ocean on January 25th, was discovered to have a leaking port, by which cargo in compartment No. 4 was damaged. The port could not be screwed tight so as to stop the leak until the outside iron blind was removed; when that was removed the port was screwed water-tight. Upon arrival at New York the brass ring of the glass door was found to be bent inwards at the top and bottom $1/16$ of an inch, on a vertical axis. The port in question was near the bridge about two feet and one-half above the water line, and 175 feet aft of the stem. A few bolts were found a little loosened about this port, and in its vicinity, and there were some scratches there; but no bolts were loosened nor was damage done for 75 feet or upwards forward of the port, nor until about abreast of the foremast where there was again some damage on the same starboard side of the ship, which arose from contact with fenders on entering Havre or departing. The expert evidence showed that violent contact with the side of the ship where the port was, might cause the glass door to be sprung, or the blind to catch, as it was found when the leak was discovered. There was no proof of such inspection at Hamburg before the ship sailed as would show the port to have been then water-tight; held (1) that the burden was upon the ship to prove sea-worthiness at the time of sailing; (2) that in the absence of sufficient inspection of the port to show seaworthiness on sailing, the ship took the risk of her inability to prove satisfactorily that the leak was caused in fact by the contact at Havre; (3) that upon a careful consideration of all the facts and circumstances, the ship had not sustained this burden, and the probabilities were against her contention that the leak was caused by the contacts at Havre, and that the ship was therefore answerable for the loss.

Cowen, Wing, Putnam & Burlingham, for American Sugar-Refining Co.

Butler, Notman, Joline & Mynderse, for Lamb. et al.

Wheeler & Cortis and Everett P. Wheeler, for claimants.

BROWN, District Judge. The above four libels were filed in behalf of some 60 consignees to recover the damage to their goods, which were shipped at Hamburg in January, 1895, on board the new steamship Phoenicia, and damaged to the amount of about $40,000 on the voyage to New York. The goods in question were all stowed in the between-decks of compartment No. 4, and consisted of a large quantity of sugar in bags, and much other miscellaneous merchandise, such as linen goods, hosiery, woollens, paper, rubber goods, earthenware, toys, musical instruments, hardware, feathers, barley, coffee, glassware, etc. The damage arose from sea water, which gained access to the compartment through a leak in one of the ordinary ports on the starboard side of the compartment a little above the water line.

The steamer sailed from Hamburg on January 14th, entered Havre at noon on the 16th, passing through two of the massive stone gateways from the Avant Port into the Bassin Bellot, and on the following high tide at about 1:40 a. m. of January 17th, left Havre by the same gateways and proceeded on her voyage. She met heavy weather almost constantly; and at 6 p. m. of the 25th of January, when near the Grand Bank, four feet of water was discovered in the well, coming from heavy dripping from beneath the between-decks of No. 4 compartment. Immediate examination disclosed the leak in question. With every roll of the ship two jets of water spurted through the port, one near the top and another near the bottom, by reason of the fact that the brass ring that held the window of the port did not close tightly upon the rubber bed against which it shut, but was bent inwards for a few inches along the top and bottom about $1/16$ of an inch. This discovery was made about $8\frac{1}{2}$ days after the steamer left Havre; and there can be no doubt that the opinion of the master is correct that the leak had then been in operation for a considerable time; that the sugar had at first absorbed the water as it entered until the sugar was saturated and then melted; and after the waterways had become choked, and the movement of the cargo, in consequence of part melting, had at last worn away the wooden part of the iron flooring and carried away some of the bearings and screws, that holes were made in the deck sufficient to permit the water to run through it as found on January 25th.

The libels charge that the vessel was unseaworthy when she sailed, on account of the imperfection of the port at that time. The answers aver that the ship was in all respects tight and seaworthy, and that the leak was caused by sea perils arising on the voyage, without any fault of the ship or her owners, either from pounding in the heavy seas, or encountering some obstructions, or as a result of two or three unavoidable contacts with the stone gateways in entering and departing from Havre, whereby the port, which was previously tight, was sprung so as to leak. The answers also allege due diligence on the part of the owners to make the ship in all respects seaworthy; that if there was any defect in the port, it was a latent defect; that by the bills of lading, it was provided, that the ship and the owner should not be liable for any latent

defect, nor for any accident of navigation occasioned by any negligence or fault of any of the servants of the ship; that all questions arising thereunder should be governed by the German law, and that by the German law, these stipulations are valid.

The Phoenicia is a new steel steamship 460 feet long, 52 feet beam and 36 feet depth of hold. She was built near Hamburg and great pains were taken to make her in every respect a first-class ship. This was her first voyage. Her trial trip was made in the River Elbe on December 28, 1894, and she was then approved and delivered to her owners, and immediately after began to take cargo on board. The window of the port in question was 10 inches in diameter, a little forward of midships, nearly under the bridge, and would touch the water line upon a mean draught of $26\frac{1}{4}$ feet. On her trial trip she was light, and this port was then from 10 to 12 feet above water. On entering Havre her mean draught was 23 feet 9 inches so that the lower edge of the port was 2 feet 6 inches above the water line; and on leaving Havre, where she took on cargo, though none additional was taken in No. 4 compartment, her draught was 4 inches greater, so that the port was then 2 feet 2 inches above water.

It is evident that if at the time of sailing the port was loose and leaky, as when found on January 25th, a leak so near the water line would render the steamer unfit for the carriage of cargo in that compartment, and that the loss should be charged to the ship. Nor could such a defect, if it then existed, be regarded as a "latent defect"; because it was easily discoverable upon inspection by the water test; a test which is easily made, and which according to the evidence is customarily made, and which reasonable prudence requires to be made, as respects ports so near the water line, before a ship sails on her first voyage. This test can be easily applied with the hose. It was applied to the decks in Hamburg, and afterwards twice applied to this glass port at New York. The particular description of the inspection made at Hamburg shows, however, that this test was not applied to any of the ports before the ship sailed from Hamburg; nor was the "chalk test" applied, which also tries the tightness of the fit. The only inspection and test there applied were to try the outer blind to see if it would go in and out, and to screw up tight the glass door and the inner cover; and that would not disclose any such leak as this, although it existed at that time precisely as when it was discovered on January 25th. Had either the water test or the chalk test been applied, there is no doubt that if any defect in this port then existed, it would have been discovered; and if it had been proved by any such test that no leak was then discoverable, no reasonable doubt would have remained that the defect arose upon the voyage, and thus the chief difficulty in the case would have been removed.

For the principal difficulty is not so much a theoretical one, whether such a leak in a sound port might possibly be produced on the voyage by the causes alleged; but whether there is such satisfactory evidence showing with a reasonable degree of certainty that the faulty condition of the port and consequent leak did arise

on the voyage, as to dispense with proof by some proper and actual test that the port was tight when the ship sailed.

A further question arises upon whom the burden of proof in this respect rests; and in case of doubt, whether the ship or the merchant shall bear the loss. Upon the latter point, the law, as I understand it, is that the burden of proof rests upon the ship. In The Edwin I. Morrison, 153 U. S. 199, 211, 215, 14 Sup. Ct. 823, the decision turned essentially upon this principle. It was there repeatedly stated by Chief Justice Fuller in delivering the opinion of the court, that it is for the owners to show affirmatively the safety and sufficiency of the ship's condition when she sails, by making all ordinary and reasonable tests. If the determination of the question of the ship's sufficiency is left in doubt, "that doubt must be resolved against the owners." The burden is upon them, it is said, "to show seaworthiness; and if they do not do so, they fail to sustain that burden, even though owners are in the habit of not using the precautions which would demonstrate the fact." "In relying upon external appearances in place of known tests," the respondents, it was held, "took the risk of their inability to satisfactorily prove the safety of the cap and plate, if loss occurred through their displacement."

These observations seem to me precisely applicable to the present case, as regards the tightness of the port in question when the Phoenicia sailed. There as here the question was whether the defective condition arose from sea perils on the voyage, or from defects existing at the beginning of the voyage.

A great mass of testimony has been taken in the present case and it has been prosecuted with extreme assiduity and skill, especially in the expert evidence. The proof shows that at least in the opinion of experts it is theoretically possible that the brass frame of a sound port might be so sprung or bent through collision with fenders, stone gateways or sea wreckage, as to produce a leak like this. But there is no evidence of the presence of sea wreckage; and though contact of the forward part of the ship with fenders in the sluiceways at Havre is proved, the evidence of any actual contact with this port is at best argumentative, and rests on inference. There is no actual proof of any severe contact with this part of the ship, and the probabilities seem to me to be to the contrary.

There are, moreover, other causes of the leak that are equally possible, more simple, and as it seems to me equally probable, which might have existed when the vessel sailed; especially a misfit of the outer iron blind, preventing the ring of the glass window from shutting tight. In the absence of any such previous trial as would test this port, or of any such inspection as would show it to be tight when the ship sailed, both the evidence of any actual contact of this port with the gateways at Havre, and the inferences drawn from the supposed contact, seem to me to be too uncertain and too hypothetical to absolve the ship and throw the loss upon the cargo owner. The evidence does not show the actual cause of the leak with requisite or reasonable certainty. As a result of all the evidence,

the most that can be said is, I think, that some doubt may possibly remain as to the cause of the leak, which cannot be certainly solved; while a misfitting blind is the most simple and probable explanation. Either of two things might have made easy a satisfactory determination of the case, viz. some actual test of the port before sailing, or the production of the outer blind that caused the trouble. Unfortunately both are wanting, and wanting through the neglect of the ship to make the tests, or to preserve and produce the blind. In the absence of these proofs the evidence in the ship's behalf is not so clear as to remove the great doubt as to her seaworthiness on sailing as respects a properly fitting blind and glass door; and the probabilities as I have said seem to me to be against her in that regard. If this is the fair result of the evidence and circumstances, as I think it is, the risk and the loss must remain upon the ship. The Edwin I. Morrison, supra; The Mascotte, 48 Fed. 119, affirmed 51 Fed. 605. The importance of the case and the labor bestowed upon it by counsel, make it proper that I should state the reasons for this conclusion somewhat more in detail.

A proper understanding of the case requires attention to the structure of the port. It was made with two brass rings and two cast-iron shutters. The outer ring, set in a circular iron frame, is bolted fast into the outer plates of the ship, through which it projects about $1/32$ of an inch. It is flush with the side of the ship when the ship is painted. In the inner brass ring is firmly set the glass window or lens, nearly 10 inches in diameter. This ring is fastened on one side to the outer ring and frame by a massive hinge working horizontally, by which the glass door is opened and shut. The inner part of this ring shuts into the outer ring; the outer part laps over the outer ring and shuts upon it; and when this door is closed it is fastened to the outer ring and frame by a heavy screw bolt or lug opposite the hinge. To protect the glass from injury from without, an outside shutter or blind, consisting of a cast-iron circular disc, is placed in the outer ring outside of the glass window, and held inboard by a narrow rim along the exterior edge of the outer ring. The blind is designed to fit loosely, so as to be easily put in or taken out at will. The blind is about $\frac{3}{8}$ of an inch thick, and strengthened by two parallel ribs about $\frac{1}{2}$ an inch high and $\frac{1}{4}$ of an inch thick running across the disc about an inch from its center. Inside of the glass window is a circular cast-iron shutter, which is attached at the top by a massive hinge to the outer ring and frame and worked vertically in opening and shutting. When shut down upon the lens and its rim, it is fastened firmly by a heavy screw bolt or lug into the outer ring and frame upon the lower side opposite to the hinge. On the outer part of the exterior surface of the window ring, is a circular V-shaped projection or bead, designed to close water-tight upon and into a bed of rubber $\frac{3}{8}$ of an inch wide laid in a corresponding groove in the outer ring upon which the outer part of the lens ring shuts. In new rubber this V-shaped projection or bead may be imbedded $\frac{1}{8}$ of an inch or more; in older and harder rubber it would be less imbedded, but would be water-tight, according to the evidence, with

an insertion of $1/16$ of an inch or less. It is only by the close fit of this rubber bearing all around that water can be excluded. On the inner face of the glass ring there is a similar V-shaped projection fitting into a similar rubber bed in the inner cast-iron shutter, which closes over the whole from the inside. When the inner shutter is screwed down on the lens ring, this inner bearing, if fitting properly, excludes water, even if the glass lens should be broken, provided the outer bearing is also tight. For that contingency it is necessary that both bearings should be water-tight.

When this leak was discovered jets of water were found coming in for a space of four or five inches near the top and bottom of the lens ring, that is, between the inner and the outer ring; and it was surmised that the top and bottom of the inner brass ring might be somewhat bent inwards, though the evidence does not show that any such distortion was seen, or could then be seen by the eye; nor is it certain that any such distortion existed at that time before the attempts were made to screw the parts tightly together.

Four things were tried to stop the leak: First, an attempt to screw tighter the bolts of the glass door and inner shutter; but these, it was found, could be moved but very little; second, inserting a piece of wood under the hinge of the inner shutter and then screwing it down; this resulted in breaking one of the shanks of the inner shutter without stopping the leak; third, an additional rubber band was then inserted between the outer V-shaped bead and the rubber bed in the outer ring; but on screwing the ring tightly down upon the added rubber, the leak was but little diminished. Finally, the glass door was opened and the outer shutter or blind was pulled in, and the added rubber band was removed. The glass door was then shut and screwed down as usual and found to be tight.

From this it is evident that whatever may have been the precise cause of the leak, the removal of the outer blind cured it. It was the cast-iron disc alone that prevented the glass from being screwed down sufficiently to make a tight fit at the top and bottom between the exterior V-shaped bead and its rubber seat. While the outer blind was in, the glass door could not be screwed down so as to exclude water. When the blind was removed, the door was screwed tight without difficulty and there was no leak; and the rest of the voyage was made without any blind outside of the glass door. Upon arrival of the ship in New York it was found on examination that the brass ring that held the window was not true, but that the upper part of it at least was bent inwards about $1/16$ of an inch. Martin, the surveyor, who examined it, speaks only of the top being bent. Mr. Congdon, thought the bottom was also bent. But this slight irregularity of $1/16$ of an inch in the inner brass ring, whether it existed when the ship sailed or not, did not prevent the glass door from being closed tightly after the outer blind was removed; and as I have said there was no subsequent leak, though the heaviest weather of the voyage occurred afterwards, and the glass door received the full force of the waves without any pro-

tecting blind. At that time, at least, the blind operated as an obstruction to a tight fit; and when the attempt was first made to pull the blind in, the assistant engineer says it was caught and was only pulled in with the help of the waves. He found no other blind caught.

Both the above-named circumstances, viz. that the blind was caught,. and that the door could not be screwed down tight until the blind was removed, suggest a misfitting blind as the cause of the trouble, which was not thrown out as it should have been. A properly fitting blind might, indeed, be thus caught by the sides of the outer ring in which it was set, if this ring was afterwards sufficiently strained and sprung to pinch it. The defendant claims that the ring was thus sprung by contact with the fenders at Havre. But the outer ring of Exhibit 16, produced as the one in question, does not show, according to Prof. Compton, any bending beyond $1/32$ of an inch at the top; the shortening of its diameter, if any, by bending at the top must have been considerably less, i. e. less than $1/32$ of an inch, and therefore, too minute to account for catching a blind with the required play, the models showing a play of $\frac{1}{8}$ of an inch; and the bend was too minute also to have any substantial effect upon the rubber fit. But more probably, as it seems to me, the blind may originally have been too large to go home perfectly in the interior of the ring, the sides of which are somewhat conical and narrowed outward; or it might bind, or not go home, because of irregularities or protuberances, such as are incident to iron castings, and which were not removed; or the blind might have been warped in casting. Screwing the glass door against a misfitting blind would make it seem tight, when it was not tight; and only the water test or chalk test, neither of which was applied to this port, would disclose the fact; and if the door was screwed down severely, as was done when this leak was discovered, some bending of the brass ring of the window would naturally result, as was shown by experiments made at the hearing. Thus all the abnormal conditions of the port itself would be answered by a misfitting or warped blind. That the blinds were sometimes defective is to be inferred from the first officer's statement that on examination "he had no cause to throw out one of the blinds"; but he also states that this blind had less play than the model (exhibit 9).

The blind itself, which is the proper proof on this subject, and which if produced would have settled this question, has not been produced in evidence. The assistant engineer, who removed it when the leak was discovered, says he threw it upon the cargo and did not see it afterwards. It does not certainly appear whether this same blind was taken to the first officer's room or not. Presumably it is not the same blind that was found by Mr. Martin in the rack near this port at the time when he carefully examined the port on Saturday evening after the Phoenicia's arrival at New York. For that blind, as he testifies, went in and out easily; and when the glass door was screwed down, the chalk test showed chalk at the top and bottom, though faintly; proving that the old glass door though bent $1/16$ of an inch still pressed the rubber;

while the ship's trial with the hose on Friday, the day before, according to the entry in the log, also proves that though pressing more lightly than at the sides, it was still water-tight. This trial of Friday must be presumed to have been for the purposes of the coming voyage, and therefore under the usual conditions required for the voyage, viz. with a blind in place; and as the old blind certainly prevented a water-tight fit, the blind used on Friday must have been a new one taken from the ship's stock or else the port could not have been tight. Moreover, there could not have been any object in trying this port with the hose on Friday without any blind in place; because the port had already been proved to be tight without any blind, by the last days of the previous voyage in the heaviest weather; and the object presumably was to test the sufficiency of the port for the coming voyage, as would naturally be done after supplying a new blind in place of the old one, which it was known had prevented a tight fit.

The blind which, according to the testimony was removed to the first officer's room along with the glass door, after the door was condemned by Mr. Martin for being untrue, was probably therefore the new blind taken from the ship's stock and used in those trials, and not the blind which had prevented the tight closing of the glass door and was thrown upon the cargo at the time when the leak was discovered. As the first officer, however, had charge of these articles, it is quite possible that the old blind was picked up and taken to his room previously. He states that the blind taken to his room and the old glass door of the port remained in his room until he left the service of the ship in the following May; but that the outer ring and frame were exchanged for similar ones taken from one of the closets on the upper deck after Mr. Martin's objection to the sufficiency of the port, and that a new door was put in from the ship's stock. Exhibit 16, having uniform numbers throughout, does not agree with this account, and it remains in doubt. It is obvious from the testimony, however, that the same blind must have been used in the officer's trial of the port on Friday, when he found it tight under the water test, and in Mr. Martin's examination of it on the following Saturday evening; and if the water test on Friday was made with a new blind, as it seems necessary to infer that it was, no doubt could remain that a defective blind was the sole cause of the leak, inasmuch as with a new blind the old glass door and outer ring screwed down water-tight. This fact, after Friday's water test, would naturally be immediately perceived by the first officer, who had charge of the ports and was responsible for having passed an imperfect blind; he would not naturally, therefore, be very active in producing the old blind, even if it were in his power to do so.

I have mentioned in detail all the dealings with the old port because these circumstances seem to me to be the most important ones in the case, as they are the only facts positively proved bearing immediately upon the cause of the leak. But even here one link in the chain does not rest upon direct and certain testimony; namely, that the blind used in Friday's water test was a new blind,

or even that any blind was then used at all, strong as the inference is that a new blind was used. I turn, therefore, to the circumstances and proof relied upon by the defendant to show that the leak was probably caused by the distortion of the glass door and outer ring, through contacts with the fenders in the sluiceways at Havre.

I have already observed that the bending of the top of the outer ring to the extent of $1/32$ of an inch only, as testified to by Prof. Compton, could not have caused a proper blind to catch, which in the models exhibited has $\frac{1}{8}$ of an inch play; nor could it have produced the leak between the outer and the inner ring. This last is conceded by Prof. Compton. What he testifies, however, might happen, and what the defendant contends did happen, is that the fender in passing over this port was forced inwards $\frac{3}{8}$ of an inch below the surface of the plates of the ship against the cast-iron circular blind (which was but $9\frac{1}{2}$ inches in diameter as the model shows), with such force as to bend inwards this cast-iron disc along its vertical axis against the ring of the glass door (which was not completely supported on that axis as it was on the horizontal axis by the hinge and bolt of the door) and thereby bent this ring inwards along the same vertical axis, so that when the pressure was removed, this bent ring, being of brass, a soft metal, and not having sufficient elasticity to resume its original position, as the cast-iron blind had, formed an opening through which the water came. The libelants' experts consider that such a bend and leak could not be produced in that way, for the reason that the vertical axis of the ring of the glass door had a sufficiently firm support to prevent it, in the hinge and lug bolt of the inner shutter, which, with the bolt and hinge of the glass door, formed four firm supports at each quadrant of the circle. Along the vertical axis, however, the rubber bed of the inner shutter was in part the support of the bead of the glass door; and Prof. Compton, as I understand, conceives that the further compressibility of the rubber bed would permit the further imbedding of the V-shaped bead sufficiently to admit of the bending described on the line of the vertical axis, and which the massive hinge and lug of the inner shutter could not prevent. The libelant's experts are of a different opinion, on the ground that the rubber, being confined in a narrow and shallow groove, would not admit of such an additional imbedding in the rubber after the door had been firmly screwed down. The correctness of these opposing theories was not tested by experiments, probably difficult to perform. (1) I do not presume to decide as between these two theoretical opinions; but inasmuch as any bending of the brass ring in the manner supposed would be limited by the possible additional imbedding of the V-shaped bead in its rubber seat, and as the recoil of the rubber itself after the pressure was removed, would certainly be great and would aid such elasticity as the brass itself possessed towards recovering its former position, it seems to me scarcely probable that the net result would leave a distortion of $1/16$ of an inch. (2) Even if this net result should be a bend of $1/16$ of an inch in the ring, the only effect would be to withdraw the V-shaped bead by so much from its previous imbedding; and

as this appears to have been about $\frac{1}{8}$ of an inch, an imbedding of $^1/_{16}$ of an inch would still remain. This with a proper blind would still leave the rubber bearing water-tight, as appears from the trial by Mr. Martin on Saturday evening, and from the water test applied the day before by the ship's officers. For Mr. Martin's chalk test showed that there was still contact at the top, though faint; and the ship's test showed that this same contact was tight. (3) There is no satisfactory proof that a cast-iron disc has sufficient elasticity to bend in the manner supposed; and when strengthened by two stout ribs, as above described, any such deflection of the blind through its center seems to me improbable. (4) It appears to me still more improbable that a fender 6 feet long with a central core of wood a foot square, surrounded by fagots bound together so as to be $5\frac{1}{2}$ feet in diameter and then flattened out while rubbing along the side of the ship about 120 feet, would have been forced $\frac{3}{8}$ of an inch below the plates of the ship against this cast-iron blind, with such force as to bend it, even if it were to any extent flexible. Such a fender when it reached the port must have been flattened out to its extreme limit, forming a surface over 6 feet long and nearly 6 feet broad. The great bulk of the pressure upon such a fender would have been taken up by those parts of it which came in contact with the ship's plates, which would mostly protect the blind $\frac{3}{8}$ of an inch below from pressure. The defendant's expert says, and no doubt truly, that most of the elasticity of the fender after such a flattening out, would be gone; but for that very reason the pressure at the bottom of the port opening would be so much the less. The port and disc moreover were further protected from harm arising from so broad a fender, by the immovable resistance of the web frame of the ship, which was but three feet from this port. Considering these circumstances, and that the pressure of the fender must have been constantly diminished as it passed along aft and the small angle between the ship and the sluiceway when the fender was near midships, it seems to me that only a very slight pressure could have descended through the opening upon this blind. Even if it appeared, therefore, that the fender rubbed over this port, it would still seem to me improbable that that caused the leak.

More important is the absence of sufficient proof to establish the fact of any contact between the fenders and this port. A casual or ordinary contact, such as might scratch through the paint or loosen a few bolts a single turn only, like these, as often happens in rounding the corners of piers in making a landing, would not be sufficient. Such ordinary contacts do not come within the exception of sea perils. To sustain the defense it is indispensable not only that contact with the glass port should be clearly established, but that the contact was of an unusual character. There is, however, no direct evidence of any contact at all between the fender and the port; and if there was any, the probabilities are that it was so slight as not to be noted or observed by those officers who were in the best position to observe it. The defendant's contention in this regard rests wholly on the first officer's testi-

mony and in fact upon his inferences, rather than upon anything that he saw. On entering Havre, there was a contact with two fenders on the south side of the outer gateway on the starboard side of the ship, beginning as the pilot testifies, a little forward of the foremast and continuing for 10 or 12 feet, when the course of the ship was righted sufficiently to pass through. The port in question was 120 feet aft of the point where the ship touched; so that if the pilot's evidence is correct, this port could not have been injured on entering Havre. The pilot further testifies that this was the only time she struck her starboard side. By that contact two fenders made of fagots as above stated and bound together so as to be 3½ feet in diameter and about 6 feet long, were flattened out. The injuries to these fenders were duly reported to the French authorities, and the damage was charged to the ship. On leaving Havre there was likewise a contact with two other fenders on the south side of the inner gateway, that is, on the port side of the ship, by which those fenders were flattened; and that damage was also reported to the authorities and charged against the ship.

The first officer testifies with some detail to a third contact, and this is the one mainly relied upon by the claimants, viz. a contact on leaving Havre on the starboard side of the ship with the fenders on the north side of the outer gateway, caused by the Phoenicia's aft davits striking the bows of the Scotia; but several of the particulars to which this officer at first testified are proved to be incorrect; and on cross-examination it appears that he did not see those fenders at all, and that he testified only from his inferences from the noises heard, while he stood far forward in an unfavorable position for observation, having stood first with his hand on the stem and running aft only about 40 or 50 feet, which was still 120 feet forward of this glass port. He is not confirmed as regards contact with this port by any other witness, though four officers on the bridge were in a much better position than he was to observe such a contact if it occurred. It evidently was not known to the pilot or the master; and the third and fourth officers, who were on the bridge, were not called as witnesses, and presumably therefore would not confirm him. The master furthermore testifies that the collision with the Scotia caused no damage to the hull of the Phoenicia, which he would not have stated had it produced a damaging contact with the sluiceway. No damage to any fender on that side of the sluices was reported; whereas if there had been any such contact as the first officer describes, the fenders must have been injured, and the fact would have been reported. He testifies moreover that he does not remember the contact on going into Havre, which is abundantly proved; so that I have no doubt that the first officer is mistaken as to this contact.

The master casually refers to a contact on the starboard side in coming out; but he says that afterwards the Phoenicia touched the Scotia; so that it is clear that the contact to which the master refers was a trivial contact in the inner sluiceway and not a serious contact in the outer sluiceway, such as the first officer supposes. The fact moreover that the master caused to be erased the mate's

entry in the log ascribing the scratches, loosening of bolts, and the leak to the contacts at Havre, and that in his protest filed on arrival the master made no allusion to these contacts, shows clearly that he did not know of any such contacts at Havre, or believe in any such contacts as would have naturally caused this damage; and this applies to the contact on entering Havre as well as to the contact on leaving.

The fact also that all damaged fenders were required to be reported to the government and charged for, and that two contacts only were so reported, leaves no doubt in my mind, in connection with the pilot's explicit testimony, that the only contacts serious enough to damage the fenders occurred on the south side of the gateways, which was the port side of the ship on coming out; and any contacts which would not damage the fenders, would not hurt the ports. The fenders in the outer sluiceway, moreover, were from four to six feet above water, while the center of the port in question was not over two feet eight inches above water. The fenders, therefore, could not have touched this port unless they were damaged by being flattened out or broken; and in that case they would have been reported. For these reasons, I cannot find any probable damage done to the port on leaving Havre.

As an alternative, it is urged that the injury may have been done by the admitted contact with fenders on entering Havre, which began abreast of the foremast, about 125 feet forward of the port; and that the pilot must be mistaken in his testimony that this contact continued for only 10 or 12 feet, since with 2 knots speed that distance would be covered in less than 4 seconds. I see nothing improbable, however, in a brief contact of from 4 to 8 seconds if the vessel was moving slowly at the rate of from 1 to 2 knots. Doubtless the pilot's estimate is not exact; but it is not probable that he would mistake 10 or 12 feet for upwards of 100 feet, or that he would fail to notice the fact, if the fenders rubbed the ship as far aft as the bridge, where he stood. His evidence indicates a brief contact, after which the ship righted so as to pass through. No other witnesses describe this contact differently. He says that having ported, "the vessel's head swung a little too far to starboard and squeezed the fenders, commencing at a point about abreast of the foremast, strong enough to straighten the vessel on her course, and we passed through the gates without any further contact." This was at noon, in full view of scores of officers and men on deck; and the fact that none of them describe it as a continued rubbing, does not permit me to disregard the pilot's testimony.

But even if the contact continued at all so far aft as to reach this port 125 feet from where it began, it is difficult to believe that at that time there could have continued to be any unusual or damaging pressure from these broadly flattened fenders. As the ship swung off forward so as to go through straight on her course, as the pilot testifies, the pressure would be relieved further aft, and at the bridge near amidships, if the ship could there touch at all, would naturally be almost nil. The pressure must have diminished rapidly after the first or second impact, and the greatest damage would have been

done to the ports and bolts further forward, where the pressure was greater. Here on the contrary, there was no damage done except in the immediate vicinity of this port, and near the foremast where the fenders first struck; while in a space of 75 or 100 feet between, no bolts even were loosened. The loosening of the bolts aft appears to have been trifling, amounting only to a single turn; and the complete separation of the damage forward from the loosened bolts and scratches amidships, indicates a different cause for the amidships damage, which was only such as often occurs in rounding the piers in landing. It is the same with the scratches referred to. The evidence as to their nature and extent is very contradictory. If any deep scratches were made in passing over the port, the soft brass metal of the outer ring would have shown them most; and this would have supplied a sure means of finding and identifying the old outer ring said to have been put on the upper deck; whereas it could not be found by the first officer; and Exhibit 16 does not show scratches.

The pilot says that the contacts were not of sufficient force to produce damage to the ship's plates; but were sufficient to produce damage to any port or bull's eye "in the immediate vicinity of the point of contact"—"to cause damage to the port near that point." I understand the pilot in this testimony to refer to the contacts as he described them: viz., brief contacts which squeezed the fenders and straightened the ship upon her course. He says he was not aware of any ports so low down on the side of the ship; and there was no port so low in the vicinity of the foremast, to which vicinity the contact, as he knew it, was confined. He told the captain, he says, "about the pressure against the fenders." Had either of them known of any serious contact of the fenders so far aft as the bridge, by which the ports were likely to be squeezed, a cursory exterior examination at least would have been made of the ports and bolts before the vessel left Havre, which would have disclosed the loose bolts if any then existed. That no examination was made, satisfies me that the master and pilot knew of no such contact in that part of the ship, while they would have known it if it had occurred. When the captain corrected the log after arrival in New York and omitted all reference to the contacts at Havre in his protest, it was because he did not think that those contacts were the cause of the trouble. The considerations in support of that opinion seem to me to be such and so many as to forbid my finding that the ship has established the contrary with any such reasonable clearness and certainty as to relieve the ship from the necessity of giving satisfactory proof of a seaworthy condition of the port at the start, by the tests necessary for that purpose.

Decrees for libelants with costs.