### THE ONTARIO.

(District Court, S. D. New York. December 29, 1900.)

1. SHIPPING—INJURY TO CARGO FROM LEAKAGE—NEGLIGENT MANAGEMENT OF THE SHIP.

The ballast tank of an ocean steamer sprung a leak during a voyage, and the water accumulated in the hold above in sufficient quantity to damage the cargo stowed therein. The leak was known to the engineer and carpenter, who failed to report it to the chief officer, to give it a proper examination, or to use the pumps with sufficient frequency to prevent the accumulation of water in the hold. The pump was sufficient, and the proper use of it would have prevented injury to the cargo. *Held*, that such negligence was the direct cause of the injury, and constituted negligence in the "management of the ship," for which the carrier was exempted from liability by section 3 of the Harter act.

2. SAME—EVIDENCE OF UNSEAWORTHINESS—BREAKING OF RIVETS.

The steamer Ontario encountered heavy weather in crossing the Atlantic, during which the seams of the ballast tank, which was constructed of iron plates riveted together, were sprung, and two rivets were lost, permitting leakage into the hold above, by which a portion of the cargo stowed therein was injured. The ship had been surveyed, and her tanks tested, but two months prior to the voyage, and had been given a certifi-

cate of classification in the highest class. Proper inspection had been made before entering on the voyage, and the tanks tested by pressure, and found tight. In the opinion of all the officers, who were called as witnesses by libelant, the leak was caused by the straining of the ship in the heavy weather during the voyage, and there was no evidence tending to contradict such opinion, or to show that the rivets lost were in any way defective in material or workmanship. *Held*, that mere inequality in the strength of the rivets was not evidence of defects in the two that were lost which rendered the vessel unseaworthy at the commencement of the voyage, but the leakage was properly attributable to excepted perils of the sea.

3. SAME—EXCEPTION IN BILL OF LADING.
Under the facts shown, the shipowners would also be exonerated from liability for injury to the cargo under a provision of the bill of lading that they should not be accountable for the unseaworthiness of the vessel at the commencement of the voyage, provided all reasonable means had been taken to provide against such unseaworthiness.

In Admiralty. Suit to recover for injury to cargo.

Black & Kneeland, for libelant.
Convers & Kirlin, for claimant.

BROWN, District Judge. The above libel is filed to recover for damages to 82 bales of wool part of a shipment of 200 bales, shipped at Odessa, Russia, on the steamship Leny by way of London, and transshipped pursuant to a through bill of lading upon the steamship Ontario, which sailed from London on July 17th, and arrived at New York on July 30, 1895. On arrival at New York, the 82 bales were found to have been damaged by sea water, which leaked through the ballast tank. The wool was stowed in the after part of No. 2 hold on top of the ballast tank, which was about 100 feet long fore and aft and ran to the engine room bulkhead. It extended across the ship to the bilges, the limbers being about $2\frac{1}{2}$ feet wide. The tank was about 3 feet deep, constructed of iron plates riveted together, on top of which was a wooden ceiling; and above that was some dunnage about 6 or 8 inches in depth, above which was the wool. The precise cause of the leak was not ascertained until after the steamer had returned to London, when examination showed that two rivets about 8 inches apart were gone out of the top of the tank, that some other rivets were weeping, and that the tank also needed hammering down at the junction of the top and side plates on the starboard edge of the plating. The tank was full in London and was tight at the beginning of the voyage. The leak developed during the trip. Any water leakage from the tank should naturally run into the limbers, and the testimony shows that before leaving London the boards over the limbers had been raised and the limbers cleaned and that they were then dry and the tank not leaking.

The steamer had been surveyed and received a general overhauling and repair, including the tank, about a year and a half prior to this voyage; and in May, only two months preceding the voyage, she had received some further repair, and had been surveyed, and her tanks tested by the board of trade, when she was pronounced A1 and received her further certificate of classification in the high-

est class. Between May and July also the engineer several times put pressure onto the tank for the purpose of testing it and always found it tight. The ship's officers, who were called as witnesses by the libelant, testify to strong gales and heavy weather on the voyage and to much rolling and pitching, though no serious damage was thereby done to the ship except the tank, nor was anything carried away. The different officers ascribe the leak to the result of strain in the laboring of the ship during heavy weather. The mate, however, surmised that there might be some rusting of the rivets or rivet holes. The rivets were not found, and it does not appear that the mate examined the rivet holes or saw any injury by rust, but he says they looked rusty, as they necessarily would after being empty. The mode of repair, by cutting a screw thread in the hole and inserting a screw-bolt instead of a screw, would indicate that the holes were not much affected by rust.

Besides the usual exceptions of sea perils, straining, etc., the through bill of lading contains among others the following exceptions:

(1) "Not accountable for the unseaworthiness of the vessel at the commencement of the voyage (provided all reasonable means had been taken to provide against such unseaworthiness), or otherwise howsoever."

(2) "The shipowner is not liable for any damage to any goods which is capable of being covered by insurance."

(3) "It is expressly stipulated and agreed that in case of any loss, detriment or damage done to, or sustained by the above-described merchandise, for which the vessel or carrier may be liable, the ship and carrier (a) shall have the full benefit of any insurance which may have been effected upon the said merchandise, and (b) in case of the payment by the ship or carrier of any such loss or damage, the ship and carrier to be subrogated to all the rights of the party effecting or holding such insurance, or having any interest therein."

The answer sets up these and other exceptions, as well as the exemption from liability for negligence in the management of the ship, under the third section of the Harter act.

The libelant contends that the vessel was not in a seaworthy condition:

(1) For insufficiency in the two rivets, which came out; (2) in that the ceiling over the iron plates of the tank did not permit any water coming from the tank to pass beneath the ceiling directly into the limbers; (3) in that the limber boards were so tight as to prevent the water that ran off above the ceiling of the tank from going through the coverings of the limbers, thus causing the water to accumulate in quantities sufficient to damage the wool.

1. The evidence does not show unseaworthiness in the limbers or limber boards at the time of sailing from London. The limbers had been carefully attended to and the coverings adjusted in what was considered the best manner, and in the same manner they had always been treated and which on competent inspection, was certified to as first class. They were somewhat close in order to prevent the limbers getting clogged with dirt.

The same observations apply to the construction of the ceiling over

the ballast tank. Different modes of construction are in use. The mode here used has been common and no evidence shows it to have been ever condemned as unfit or unseaworthy. It is said that the limber boards had become swollen on the voyage, so as not to let the water through them fast enough into the limbers. This would be a natural consequence of any accumulation of water through remissness in a sufficient use of pumps.

The final damage to the wool is in fact attributable, I think, to the failure of the carpenter and the engineer to report to the chief officer the leak from the tank when it first became inferentially known to them, and to their failure to give the leak sufficient attention, and to use the pump with sufficient frequency. The engine pump connecting with the well could have been kept going as continuously as desired. It was used sometimes once in a watch, sometimes twice. But no attempt was made to ascertain whether there was any accumulation of water over the limbers, or any damage arising to the cargo. The continuance of the leak was evident from the necessity of pumping every watch. Had the pump been worked oftener it seems to me that no accumulation of water could have arisen or damage been done to the cargo. The omission to report the leak to the chief officer so that an examination might be made for the protection of the cargo, and neglect to keep the pump going enough to prevent accumulation of water and the swelling of the limber coverings, were negligence in the "management of the ship" during the voyage. And as the pump was sufficient and the proper use of it is the ordinary means provided and relied upon to prevent damage from such leaks as this, the neglect to make proper use of the pump brings the case within the exemption in the third section of the Harter act (2 Supp. Rev. St. 81). The British King (D. C.) 89 Fed. 872, 874, affirmed in 35 C. C. A. 159, 92 Fed. 1018; Dupont v. Vance, 19 How. 168, 15 L. Ed. 584.

2. Aside from this, however, and looking at the loss of the two rivets as the antecedent cause of the damage, I do not think that the evidence on that point is sufficient to justify the finding that the vessel was unseaworthy when she sailed. In the case of The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181, the damage happened on one of the vessel's first voyages; there was direct and definite proof of latent defect in the rivet itself; and it was upon this direct proof of defect that the district court and the appellate court found the ship in that respect unseaworthy. In the case of The Phœnicia (D. C.) 90 Fed. 116, actual defect in construction was also found to be the cause of a leak in one of the ports on the first voyage. In The Friesland (D. C.) 104 Fed. 99, the evidence of deep wear by a valve was deemed sufficient proof of a long failure in proper inspection. Here the circumstances are all reversed. There is not only no evidence of any defect in the material or workmanship of these rivets, but the fact that the steamer had made many voyages without leak from them, affords sufficient proof that the material and work were good. The Exe, 6 C. C. A. 410, 57 Fed. 399, 401. The evidence shows, moreover, the application of all the

usual and ordinary means of making the ballast tank secure by overhauling and repairing the ship at proper intervals and by testing the tank by frequent trials, and the ordinary tests were applied shortly before the ship sailed on this voyage. Competent experts testify that these tests are all that are deemed necessary; and those tests showed that the tank was sound and tight. No leak was discovered until after the ship had experienced heavy weather. On the fourth day out, July 20th, the log records: "Ship pitching heavily; strong breeze and heavy head sea, shipping water over all; same weather continuing during the afternoon and night." July 21st, 4 a. m.: "Same; ship diving heavily and shipping heavy water over all." On the 24th, 4 a. m.: "Fresh wind and heavy head swell, ship pitching heavily." On the 26th, 8 p. m.: "Heavy confused sea;" and similar weather continuing till the following noon, the entry then being "Very high S. W. swell, ship pitching heavily."

The testimony of the ship's officers whom the libelant made his own witnesses, is to the same effect. The libelant is not at liberty to discredit their testimony, though he may show it to be mistaken. But this he has not done. Their evidence as to strain is corroborated by "weeping" about other rivets in the same part of the tank, and by the fact that the leak from them had to be repaired by "caulking," that is, "the edge of the tank was hammered up tight." Considering that this was all tight under test by pressure on leaving London at the beginning of the voyage, the inference of strain from the heavy rolling, pitching and lurching as testified to seems to me unavoidable; and given any such starting of the plates by strain the snapping of some rivet heads and consequent loss of the rivets, is not unnatural. The fact that only two rivets were thus lost does not warrant the inference of latent defect in the absence of all other proof; as above observed, their previous service is proof to the contrary. In the case of The Sandfield, 34 C. C. A. 612, 92 Fed. 663, the court of appeals for this circuit very definitely and pointedly ruled that mere inequalities in service where no defects are shown by the evidence, do not warrant the inference of unseaworthiness. Notwithstanding the fact that the rivet in that case had been driven in somewhat aslant, the court by Wallace, C. J., on this point say:

"The theory upon which it is insisted that the steamship was unseaworthy is that the rivet in question was defective. Undoubtedly the rivet was not as perfect as the workman might have made it, and was less capable of resisting the effects of strain and vibration than if it had been absolutely strong and perfect as the best or average of the many thousand rivets in the vessel, but we agree with the district judge who decided the case in the court below that 'any such mere inequality in the strength of the rivets does not amount to unseaworthiness.' Whether the vessel was unseaworthy or not is to be determined by the test whether she was reasonably fit for the contemplated voyage. Dupont v. Vance, 19 How. 162, 15 L. Ed. 584; Carv. Carr. by Sea, § 18; The Silvia (Oct., 1898) 19 Sup. Ct. 7. If she was, it matters not that she was not impregnable to the assaults of the elements. If a vessel is reasonably sufficient for the voyage, and is lost by a peril of the sea, her owner is not responsible, as a carrier, for the cargo lost, upon proof that a stouter vessel would have outlived the storm. Ang. Carr. 173. It does not follow, because the rivet loosened in consequence of the extraordinary strain which the vessel encountered, that it was one which would have been pronounced insufficient

by men of competent judgment, upon an examination and full appreciation of its condition at the beginning of the voyage. No expert testified that such a rivet would have been considered unsafe. On the contrary, the only witness to whom such a question was addressed—a shipbuilder and mechanical engineer of great experience and intelligence—testified that the irregularity was not an unusual one, and was not enough to affect the strength of the rivet substantially. Persuasive evidence that the rivet was originally reasonably strong and sufficient is found in the fact that it had proved to be so throughout the previous voyages of the vessel."

I do not perceive that the present case differs in principle from the decision in The Sandfield, and numerous other cases (see The Warren Adams, 20 C. C. A. 486, 74 Fed. 413; The British King [D. C.] 89 Fed. 872; The Titania [D. C.] 19 Fed. 101, 107, and cases there cited) where leaks arising in the course of heavy weather to a ship proved by abundant testimony to have been carefully observed and tested in the particulars complained of and found in all respects reasonably fit for the voyage, are held to be properly attributable to the excepted perils or dangers of the seas, and not to unseaworthiness.

3. From the above view of the facts it is evident that even if the loss of the two rivets could be deemed to warrant a finding of unseaworthiness, the first exception above quoted would still furnish an adequate defence; since the facts as I have found them show that "all reasonable means had been taken to provide against such unseaworthiness."

Without considering the other exceptions the libel should be dismissed with costs.