THE NINFA.

(District Court, D. Oregon. October 7, 1907.)

No. 4,725.

1. SHIPPING—RELATION OF SHIP TO CARGO—HARTER ACT.

Section 3 of the Harter act (27 Stat. 445, c. 105 [U. S. Comp. St. 1901, p. 2946]), which provides that, if the owner of a vessel shall exercise due diligence to make such vessel in all respects seaworthy and properly manned and equipped and supplied, neither the vessel nor owner shall be liable for loss or damage to cargo resulting from faults or errors in navigation or management, nor from perils of the sea, as construed by the Supreme Court, does not exempt the vessel nor owner from liability for the consequences of unseaworthiness, even though due diligence was exercised to make her seaworthy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 492.

Statutory exemptions of shipowners from liability, see note to Nord-Deutcher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.]

**2. SAME—SEAWORTHINESS—DUE DILIGENCE.**

Due diligence to make a vessel in all respects seaworthy, within the meaning of section 3 of the Harter act (27 Stat. 445, c. 105 [U. S. Comp. St. 1901, p. 2946]), does not require merely due diligence on the part of the owner himself, nor in respect to construction only, but on the part of those to whom the owner has intrusted the duty, and in respect, not only to construction, but also to inspection, maintenance, and repair.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 492.]

**3. SAME—LIABILITY FOR DAMAGE TO CARGO—BURDEN OF PROOF.**

Where the proof shows damage to the cargo, the burden is cast upon the ship to establish the fact of seaworthiness, or to show due diligence in ascertaining whether or not she was in fact seaworthy, and in making her so at the beginning of the voyage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 481, 482.]

**4. SAME.**

The iron ship Ninfa, 20 years old, was purchased and soon thereafter chartered by the new owner to carry a cargo of cement from London to the port of Los Angeles, Cal., and Portland, Or. At the time of the sale she was examined cursorily by agents of the purchasers, one of whom tested the deck somewhat with a hammer and a small knife, but no thorough inspection was made. In the north Atlantic she encountered rough weather for several days, during which the seas washed over her decks, and at the end of that time it was found that there was a considerable quantity of water in the hold, which was pumped out. Such water admittedly entered through her deck seams, which were open in places and were partially calked by the master before reaching Portland. The weather encountered was no worse than might have been anticipated, and the ship during the most of the time did not greatly shorten sail and did not suffer material injury. On reaching port the cargo was found to have been seriously damaged by water; the cement in the lower tier of barrels being completely solidified. *Held*, that the damage was not due to perils of the sea in a legal sense, but to the unseaworthiness of the ship, and that the owners did not exercise due diligence in inspection and to make her seaworthy before the commencement of the voyage, such as to relieve the ship from liability.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 492.

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

In Admiralty. Suit for damage to cargo.

Libelants chartered the ship Ninfa (J. A. Maresca & Sons being the owners) for the carriage of a cargo of cement and other lawful merchandise from London, England, to the port of Los Angeles, Cal., and Portland, Or. The charter party contained the ordinary warranty that the ship was tight, staunch, and strong, and in every way fit and seaworthy for the carriage of the cargo upon the voyage contemplated. When the ship arrived at Los Angeles, a large part of the cargo was discharged at that port, and was found to have been seriously damaged by contact with sea water taken into the ship's hold. The ship then continued on to Portland, where it was ascertained that other portions of the cargo were damaged from the same cause. The purpose of the libel is to recover compensation for the damages to cargo thus sustained; the grounds assigned therefor being the unseaworthiness of the vessel and negligent stowage and dunnage of the cargo.

The ship is an English craft, of iron, and was constructed in about the year 1882. It was purchased by Maresca & Sons in December, 1902. Capt. Lauro Lauro, who was in charge on this voyage, states that at the time of the purchase he went over the ship with another captain, and "at that time it was in very good condition"; that he examined her carefully all over, her "hull," "portholes," "decks," "in every place; looked all over the ship;" and that it

was a few days afterwards that he commenced to load the cargo. On cross-examination he testifies as follows: "Q. How long were you on the ship? How long did you spend examining her? A. I went in the day two or three times. Q. Two or three times in one day? A. No; not one day. I went around to look. I was very careful to look around. Q. Did you try her decks? A. Yes. Q. How? A. I try with— What do you mean? Q. Did you examine her decks? A. Yes; I look at the decks. Q. How long did you spend looking at the decks? A. Half or three-quarters of an hour. Q. Did you try the decks in any manner? Did you test them? A. No— Well, the captain, the nephew of the owner, tried the decks. Q. You didn't? A. I did not." And further, on redirect examination: "Q. But when you got down to look at the ship, do I understand you rightly that you were with him? A. Yes. Q. Now, did you see, or did you not see—I want to know what the fact is—what Mr. Maresca did when he was looking over the ship? A. He got a hammer and went to knock around the ship in every place he can. Q. Did he have anything else but a hammer? A. He got a knife—a small knife. Q. What did he do with the knife, if anything? A. To try to take off some rust, if any. Q. He went around with a knife and tried the deck. You saw him do that, did you? A. Yes; but I don't try the deck. Q. But he did, though? A. Yes; he did." Surveys of the ship by the Italian consul at London, and by Lloyd's agent at the same place, show that the ship, prior to the time of her loading, and at the time she was ready to sail, was seaworthy and properly stowed.

In describing the weather and the sea from about February 5, 1903, Capt. Lauro testifies: "From that time to the tropics always bad weather. * * * Very changing weather. One hour calm: by and by plenty of wind; always very confused sea, big swell. Sometimes I take in the sails; sometimes I loose them. * * * Nearly always bad weather, with plenty of water on deck; always water on deck. * * * The ship was rolling and pitching, * * * rolling and laboring very much. * * * The last bad weather was very bad weather. I found water in the well. * * * I ordered the pump just to dry that water as soon as I can. There was always plenty of water on deck, and the ship was straining and laboring heavily, and the crew was pumping and was doing the best they can." It was some days before the well was pumped out. The witness continues: "When I reached the trade wind—the good weather—I calked the fore peak, the deck, and some seams on deck fore and aft the ship, along the ship. * * * In some places three or four feet here; three or four feet here; four or five feet another seam. Perhaps in the same seam alongside the ship I calked two or three places in the seam, and so on, around the deck. * * * When I finished that bad weather I came into the trade wind, north Atlantic trade wind. Then I calked that part under the forecastle." A gale of wind was encountered off Staten Island, lasting for about two days; and after rounding the Horn it is related that "bad weather with big sea and water on deck" prevailed for from 15 to 20 days, but no water was found in the well or hold of the ship again upon the entire voyage. In the south Pacific it was found that the oakum had squeezed out or spewed up somewhat upon the deck. Capt. Lauro says further: "I found the oakum spewed out in the north Atlantic after that bad weather. After that I calked some seams, in the north Atlantic, and coming to Los Angeles I saw that the deck need all to be calked; and after that, coming up from Los Angeles to Portland, I calked the deck, just to prepare the ship—the deck can't pass—just to avoid expense in Portland. I calked that deck from Los Angeles to Portland just to prepare the ship for survey." Being asked, "Why did she leak from the deck, if you know?" witness answered: "I know that, when the ship was straining in the very bad weather, the deck might leak."

The damage sustained by the ship up to the 23d of February, which is all that she suffered on the entire voyage, consisted in breaking the fore topmast staysail, the first jib sheets, a wooden ladder leading up on the poop, and a fastening of the anchor, and, further, a piece of the figure-head was lost; but nothing was loosened on deck. At Los Angeles the captain made a protest, which shows, among other things, the following: "That in the morning of

said 23d February, while running under lower topsails, there was a very strong southwest gale blowing, and a very rough sea; the ship laboring heavily and taking large quantities of water. That on examining the well it was found that a considerable quantity of water had leaked into the hold, owing to the deck of the ship being strained by the heavy laboring in the rough sea." This he explains as not stating the full fact, because the officer who drafted the protest did not insert therein the full and true information given him, which the captain says was contained in his record, as follows: "In the morning of the 23d of February, having wind from sou'west of exceeding force and tempestuous sea boiling up from different points, which from every part broke outside of the ship and on deck, causing the ship to labor extraordinarily. We found much water in the well. We pump constantly until the well was dry. The water came up mixed with cement." Capt. Lauro states, however, that the protest was fully explained to him in English before he subscribed and swore to the same.

A. Lester Best, one of Lloyd's agents, of Los Angeles, made a survey of the vessel upon its arrival at that port, and reported that: "On an examination of the 'tween-decks and the hold of the ship, we find that the water came in freely through the decks in a number of places, especially on the starboard side of the ship abreast of the mainmast, and also aft and round the mizzen mast." Capt. Hoben, a man of large experience as a marine surveyor, made a survey of the ship in this port, at the request of libelants, and in answer to the question, "Where did that ship show evidence of having leaked in the decks—in what portion of the ship?" says: "Oh, there was practically all over the main deck. It appeared to me that the deck wasn't in good condition when the ship left home, and that they found out the deck was leaking, and they calked it here and there, wherever they thought it was leaking the most."

It was shown by competent witnesses that the dunnage consisted of four or five inches along the keelson, extending on either side from four to ten feet, but that there was none at the bilge or in the wings of the ship. It was further shown that a proper and sufficient dunnage would have consisted of from four to six inches at the keelson, and not less than ten at the bilge or in the wings. There is further evidence tending to show that the vessel had received no perceptible strain in the parts usually affected by heavy gales and stress of weather. The cargo was found on arrival in this port to be damaged. The cement in the bottom tier of barrels was hardened by contact with the water, and that in the next tier above considerably affected by the same cause.

Williams, Wood & Linthicum, for libelants.

W. C. Bristol, for respondent.

WOLVERTON, District Judge (after stating the facts as above). It has been made a question as to what bearing the Harter act has upon the determination of this controversy. The respondent maintains that it has a distinct and persuasive bearing, while the libelants, upon the other hand, put it beside the case, and assert that, under its proper construction, it is without important application, in view of the facts as substantiated by the evidence. In this relation I will make some inquiry as to the state of the law prior to the adoption of the Harter act and the causes that led up to its enactment.

Where not qualified or restricted by an express agreement, there was an implied warranty by the shipowner attending every contract for the carriage of goods at sea that his vessel was seaworthy at the outset of the voyage, which warranty was absolute, not depending in any measure upon the observance of diligence, or upon knowledge or ignorance respecting her actual condition in any particular. Chancellor Kent expresses the rule in the following language:

"The ship must be fit and competent for the sort of cargo and the particular service in which she is engaged. If there should be a latent defect in the vessel, unknown to the owner and not discoverable upon examination, yet the better opinion is that the owner must answer for the damage caused by the defect. It is an implied warranty in the contract that the ship be sound for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted perils." 3 Kent's Com. 205.

The rule was expressly applied in England in The Glenfruin, 10 P. D. 103, and The Cargo ex Laertes, 12 P. D. 187. In each of these cases there was a breakage caused by a latent defect not discoverable by the exercise of reasonable care. In the former it was held that under the implied warranty of seaworthiness the shipowner contracts, not merely that he will do his best to make the ship reasonably fit, but that she shall really be fit for the voyage; and in the latter that the ship was not seaworthy, and that, but for a limitation on the implied warranty in the bills of lading, there would have been a breach. The Supreme Court of the United States has adopted the following language, stating the doctrine, being an utterance of Mr. Justice Gray while sitting in the Circuit Court, namely:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence." The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825, 38 L. Ed. 688.

And Mr. Chief Justice Fuller, in the decision rendered in The Caledonia, 157 U. S. 124, 131, 15 Sup. Ct. 537, 540, 39 L. Ed. 644, where it was urged that the warranty was not absolute and did not cover latent defects not ordinarily susceptible of detection, after a citation of the case of The Edwin I. Morrison and a review of many authorities, says, with perspicuity:

"In our opinion the shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects."

This case was determined shortly prior to the adoption of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), and is conspicuous as showing the state of the law at the time as it relates to the rule pointed out. Mr. Justice Brown has shown the purpose of the Harter act, and the causes that led to its adoption, in The Delaware, 161 U. S. 459, 471, 16 Sup. Ct. 516, 522, 40 L. Ed. 771. He says:

"It is entirely clear, however, that the whole object of the act is to modify the relations previously existing between the vessel and her cargo. This is apparent, not only from the title of the act, but from its general tenor and provisions, which are evidently designed to fix the relations between the cargo and the vessel, and to prohibit contracts restricting the liability of the vessel and owners in certain particulars connected with the construction, repair, and outfit of the vessel and the care and delivery of the cargo. The act was an outgrowth of attempts, made in recent years, to limit, as far as possible, the liability of the vessel and her owners, by inserting in bills of lad-

ing stipulations against losses arising from unseaworthiness, bad stowage, and negligence in navigation, and other forms of liability which had been held by the courts of England, if not of this country, to be valid as contracts and to be respected, even when they exempted the ship from the consequences of her own negligence. As decisions were made by the courts from time to time, holding the vessel for nonexcepted liabilities, new clauses were inserted in the bills of lading to meet these decisions, until the common-law responsibility of carriers by sea had been frittered away to such an extent that several of the leading commercial associations, both in this country and in England, had taken the subject in hand and suggested amendments to the maritime law in line with those embodied in the Harter act."

So Mr. Justice Shiras says, as to the purpose of the act:

"Plainly the main purposes of the act were to relieve the shipowner from liability for latent defects not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damage or loss, resulting from faults or errors in navigation or in the management of the vessel." The Irrawaddy, 171 U. S. 187, 192, 18 Sup. Ct. 831, 833, 43 L. Ed. 130.

The first section of the act relates to and inhibits any agreement whereby the vessel, its owner, master, or agents, may be relieved of the consequences of its or their own negligence, fault, or failure in the proper loading, stowage, care, or delivery of any goods or property committed to its or their charge for carriage. Obviously, in view of the causes, as related by Mr. Justice Brown, leading up to and inducing the adoption of the act, such a provision was deemed essential to prevent the shifting of burden for the consequences of fault or failure of duty to those who were innocent thereof and had a right to expect faithful service. In other words, the statute anchors the duty where it lay under the old and long-established rule in maritime law, which is so just and equitable that fair dealing would not admit of its being obviated by stipulation or contract. Note the section relates to loading, stowage, care, and proper delivery.

The second section relates to and inhibits any agreement whereby due diligence on the part of the vessel, or its owner, master, or agents, to properly equip, man, provision, and outfit the vessel, and to make her seaworthy and capable of performing her intended voyage, may be relieved against. It also inhibits any relief by contract against the existing obligations of the master, officers, agents, or servants to carefully handle and stow the cargo, and to care for and properly deliver the same. This section has, in effect, been construed as authorizing the vessel to contract against the obligation of seaworthiness, but not against the duty of exercising due diligence to render her in all respects seaworthy and fit for the voyage contemplated, but that, without a contract for the purpose, the section does not, of its own force and operation, relieve against the obligation of providing a seaworthy vessel. In other words, by the intendment of the provision under consideration, it is still incumbent upon the owner, master, or agents to provide a seaworthy ship, unless by contract he or they shall limit their obligation to the exercise of due diligence to make her so. This latter obligation cannot, however, under any conditions, be relieved against. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181.

The third section provides that, if the owner shall exercise due diligence to make his vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel nor her owner shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of the vessel, nor shall either be held liable for losses arising from dangers of the sea, acts of God, public enemies, etc. In the case last cited Mr. Justice White has placed a construction on this section in language following:

"The exemption of the owners or charterers from loss resulting from 'faults or errors in navigation or in the management of the vessel,' and for certain other designated causes, in no way implies that, because the owner is thus exempted when he has been duly diligent, thereby the law has also relieved him from the duty of furnishing a seaworthy vessel. The immunity from risks of a described character, when due diligence has been used, cannot be so extended as to cause the statute to say that the owner, when he has been duly diligent, is not only exempted in accordance with the tenor of the statute from the limited and designated risks which are named therein, but is also relieved, as respects every claim of every other description, from the duty of furnishing a seaworthy ship."

To understand the point in controversy in the case, it should be stated it was found that the sole cause of the accident giving rise to the suit was a latent defect in a rivet passing through a ballast tank, from which the head had broken off, leaving a hole through which water poured in and upon the merchandise of the libelant. This defective condition of the rivet was found to have been caused by the fact that the quality of iron had been injured during the construction of the vessel by too much hammering, so that it became brittle and weak, rendering it unfit to sustain the reasonable pressure caused by filling the tank with water while at sea, and consequently causing the vessel to be unseaworthy at the time the bills of lading were issued and the goods were received on board. The contention made was that, as the owner exercised due diligence to make the vessel seaworthy, he was consequently not liable, because, under the present state of the law, the shipowner is no longer under the obligation to furnish a seaworthy ship, but only to exercise due diligence to do so. Wallace, Circuit Judge, sitting in the Court of Appeals, Second Circuit, places this interpretation upon the language of Mr. Justice White:

"The provisions of the statute known as the Harter act (section 3), by which, if the owner 'has exercised due diligence to make the said vessel in all respects seaworthy, neither the vessel, her owners, agent, or charterer, shall be held liable for losses arising from dangers of the sea' (27 Stat. 445), does not relieve the vessel, notwithstanding it is satisfactorily proved that due diligence was thus exercised by the owner." The Sandfield, 92 Fed. 663, 664, 34 C. C. A. 612, 613.

And such was the understanding of Dallas, Circuit Judge, in the case of Farr & Bailey Mfg. Co. v. International Nav. Co., 98 Fed. 636, 637, 39 C. C. A. 197, 198, wherein he says:

"This act has not modified the obligation of owners to furnish a seaworthy ship."

And such is undoubtedly the correct rendering of the decision. But, if there was any question about the understanding, it is set at rest by the declaration of Mr. Justice Brown in his dissenting opinion ren-

dered in the same cause, wherein he says (page 664 of 170 U. S., and page 757 of 18 Sup. Ct. [42 L. Ed. 1181]) :

"I agree with the majority of the court that the Harter act cuts no figure in this case. While it is possible that the framers of this act may have intended to exonerate ships from the consequences of unseaworthiness, where due diligence had been used to make them seaworthy, it must be conceded that the language of the third section does not express such intent, since it only exonerates them from loss or damage resulting from faults or errors in navigation or management."

And also by the explicit enunciation of the court in the later case of The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 8, 43 L. Ed. 241, that:

"The Harter act has not released the owner of a ship from the duty of making her seaworthy at the beginning of her voyage"—citing The Carib Prince.

I have been impressed that the statute (this third section) prescribes a condition which in respect of its operation has the same effect as if a stipulation were inserted in the bill of lading exempting the vessel or owner from the consequences of unseaworthiness, provided due diligence was observed in rendering the vessel seaworthy. In illustration, in the case of The Friesland (D. C.) 104 Fed. 99, 100, the bill of lading contained, among other things, the following exceptions:

"It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by * * * any latent defect in hull or machinery or appurtenances, * * * or by unseaworthiness of the ship at the time of shipment, or the commencement of or any period of the voyage, provided the owners have exercised due diligence to make the vessel seaworthy."

The court says, commenting upon the agreement, that:

"Assuming the validity of this stipulation (The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181), the question presented is whether the evidence shows the exercise of due diligence by the respondent to make the steamer seaworthy as respects the condition of the valve chest."

And further:

"The stipulation in the bill of lading releases the shipowner from responsibility for absolute seaworthiness, provided due diligence is exercised; but it does not release him, nor does it profess to release him, in the least from his previous obligation to make such careful inspection as the circumstances require."

It was there found that a certain valve was out of order, from wear and corrosion, rendering the vessel unseaworthy, and that it was a lack of the exercise of due diligence in making her seaworthy.

In the case of The Ontario (D. C.) 106 Fed. 324, it was held that, under the facts obtaining, the shipowners were exempted from liability for injury to the cargo, under a provision of the bill of lading that they should not be accountable for the unseaworthiness of the vessel at the commencement of the voyage, provided all reasonable means had been taken to provide against such unseaworthiness.

The Phœnicia (D. C.) 90 Fed. 116, presents another case wherein the question of latent defects and due diligence in securing seaworthiness under bill of lading is considered. And the later case of International Navigation Co. v. Farr & Bailey Manufacturing Co., 181 U. S. 218, 225, 21 Sup. Ct. 591, 593, 45 L. Ed. 830, by some expressions found in the opinion by the eminent Chief Justice, seems to lend sup-

port in the same direction. There the vessel was found unseaworthy by reason of both the covers of the after port on the starboard side being left unfastened and open when she entered upon her voyage. I quote the expressions alluded to:

"We do not think that a shipowner exercises due diligence, within the meaning of the act, by merely furnishing proper structure and equipment; for the diligence required is diligence to make the ship in all respects seaworthy, and that, in our judgment, means due diligence on the part of all the owners' servants in the use of the equipment before the commencement of the voyage and until it is actually commenced."

Then, referring to the second section:

"The obligation was to use due diligence to make her seaworthy before she started on her voyage."

And, finally:

"We repeat that, even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised; and it is for the owner to establish the existence of one or the other of these conditions."

The impression is also in harmony with the interpretation by an English decision of a bill of lading incorporating the Harter act (Dobell & Co. v. Steamship Rossmore Co., 2 Q. B. 408), cited in the opinion quoted from, wherein it was held that:

"To exempt the shipowner from liability it was not sufficient merely to show that he had personally exercised due diligence to make the vessel seaworthy, but that it must be shown that those persons whom he employed to act for him in this respect had exercised due diligence."

In that case, through the negligence of the ship's carpenter, who was a competent person, the ship entered upon her voyage with a port improperly calked, which rendered her unseaworthy.

Referring again to the act, the second section renders the obligation of the owner or owners to exercise due diligence to make the vessel seaworthy and capable of performing her intended voyage binding at all events and notwithstanding any stipulation to the contrary. So, with that obligation irrevocable and insusceptible of being thrown off, the third section has provided, by bringing the pertinent clauses into juxtaposition:

"If the owner of any vessel * * * shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied * * * nor shall the vessel, her owner or owners, charterers, agent or master be held liable for losses arising from dangers of the sea or other navigable waters."

And I was constrained to the view that this provision answers the stipulation that could be made under the old law, and is now proper to make, against latent defects or unseaworthiness when due diligence is exercised to detect or remedy the deficiency. But such rendering is not in accord, as it seems, with the holding of the Supreme Court in the case of The Carib Prince; and I cannot say that it was the purpose of the court by the later decision of International Navigation Co. v. Farr & Bailey Manufacturing Co. to overrule or modify such hold-

ing. I am therefore bound by the clear ruling of the court in the former case.

However, a distinction has been observed between latent defects attending the construction of a ship and those deficiencies, arising subsequently, which may be discovered and remedied through "inspection, maintenance, and repair." I refer to the case of The Alvena (D. C.) 74 Fed. 252. There the damage to a consignment of sugar was caused by means of cracks in some manner produced in a layer of cement designed to protect the iron plate of the vessel, through which sugar drainage had set up a corrosion of such iron plate and produced an aperture admitting sea water, to the injury of the cargo. Brown, District Judge, in determining the cause, has this to say:

"This act has been supposed to relieve the vessel from the consequences of all latent defects in her construction, where 'due diligence' has been used to make her perfect; and in the case of The Millie R. Bohannon (D. C.) 64 Fed. 883, I stated that understanding of the act. See, also, The Silvia, 15 C. C. A. 362, 68 Fed. 230, 232. The language of the third section of the act, however, extends only to 'damage or loss resulting from faults, or errors in navigation or in the management of the vessel' or 'from dangers of the sea'; and it is at least doubtful whether any loss arising solely from a latent defect in the ship, and not through any fault or error of navigation or management, is covered by the act. The requirement of 'due diligence,' however, is not satisfied by the mere appointment of competent persons to repair. Due diligence in repair and equipment must be exercised in fact. The Mary L. Peters (D. C.) 68 Fed. 919; The Flamborough, 69 Fed. (D. C.) 470. See The Rossmore (1895) 2 Q. B. 408. There is no question here of latent defects in the structure of the ship, but only of due diligence in inspection, maintenance, and repair: and the Harter act does not establish any new rule of diligence as to either of those subjects. The obligations of due diligence to make the ship seaworthy are in all respects the same as before the act."

Upon the authority of this case I am impelled to the application of the test of "due diligence" in discovering faulty conditions and maintaining the ship under inquiry in all respects in suitable repair for undergoing the voyage contemplated, rather than that of absolute seaworthiness. This I do because whatever injury was sustained by the cargo in the present case came about by leakage through the deck, and the defects or deficiencies conducing to the leakage were in all probability not a matter pertaining to structure, but such as were brought about by use and the deterioration of time. As observed in the opinion rendered in the case just cited, the "due diligence" required must have been exercised in fact.

A ship is seaworthy if it is reasonably fit to carry the cargo which it has undertaken to transport. Says Mr. Justice Curtis, in Dupont de Nemours & Co. v. Vance et al., 19 How. 162, 167, 15 L. Ed. 584:

"To constitute seaworthiness of the hull of a vessel in respect to cargo, the hull must be so tight, staunch, and strong as to be competent to resist all ordinary action of the sea and to prosecute and complete the voyage without damage to the cargo under deck."

It is unnecessary to seek further definition as to seaworthiness, as the authorities all concur. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Sandfield, supra; The Orient (C. C.) 16 Fed. 916.

Where there is a warranty of seaworthiness under the charter party, and the proof shows damage to the cargo, the burden is cast upon the

ship to establish the fact of seaworthiness, or to show due diligence in ascertaining whether or not the ship was in fact seaworthy before entering upon her voyage. It is said in The Edwin I. Morrison, supra:

"Perils of the sea were excepted by the charter party; but the burden of the proof was on the respondents to show that the vessel was in good condition and suitable for the voyage at its inception, and the exception did not exonerate them from liability for loss or damage from one of those perils to which their negligence, or that of their servants, contributed."

After further consideration, the court makes this observation, which applies very nearly to the facts developed in the present controversy, to wit:

"The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. Their warranty that the vessel was seaworthy in fact 'did not depend on their knowledge or ignorance, their care or negligence.' The burden was upon them to show seaworthiness, and, if they did not do so, they failed to sustain that burden, even though owners are in the habit of not using the precautions which would demonstrate the fact. In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate if loss occurred through their displacement."

This authority is often alluded to with approval in subsequent decisions. See The Phœnicia, supra; In re Meyer (D. C.) 74 Fed. 881; The Nord-Deutscher Lloyd v. President, etc., 110 Fed. 420, 49 C. C. A. 1.

"Perils of the seas" are defined and construed as follows:

"The words 'perils of the seas' embrace all kinds of marine casualties, such as shipwreck, foundering, stranding, etc., and every species of damage done to the ship or goods at sea by the violent and immediate action of the winds and waves, not comprehended in the ordinary wear and tear of the voyage, or directly referable to the acts and negligence of the assured as its proximate cause." Tuckerman v. Stephens, etc., Transp. Co., 32 N. J. Law, 320.

Judge Story gives this definition:

"The phrase 'danger of the seas,' whether understood in its most limited sense as importing only a loss by the natural accidents peculiar to that element, or whether understood in its more extended sense as including inevitable accidents upon that element, must still, in either case, be clearly understood to include only such losses as are of an extraordinary nature, or arise from some irresistible force, or some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." The Schooner Reeside, 2 Summ. 567, Fed. Cas. No. 11,657.

With these observations as to the rules of law applicable in cases of this nature, I will now determine the cause as it seems to me the facts warrant. It must be first premised that the ship Ninfa was 20 years old. Shortly after leaving port, namely, about February 7th, she encountered heavy seas, with more or less wind, not amounting to a gale, which continued until the 23d, when water was discovered in her hold. On the latter date the log book shows that she was sailing "with the lower topsail only, furious wind and chopped sea breaking all over the ship, shaking very much." She continued through the stress until the evening at 8 o'clock, when the discovery was made that she was taking water. It was only upon the 23d, and not prior thereto, that the sails were reefed so as to leave the lower topsail only for propelling the ship. The day previous the log book at 1 a. m. reads:

"On starboard tack, with all the lower sails except the main, fresh wind and heavy sea."

At 1 p. m.:

"Wind still freshening. We cannot hold the foresail any longer, so we furl it."

The day previous to that:

"With the lower sails, sea from starboard, fresh wind, and very heavy sea; the ship suffering very much for the heavy rolling."

On the 20th:

"More steady wind, running with lower sails and main topgallant."

And on the 19th:

"With all the sails except the small ones; little wind."

And so on back, with some change of sail, but not of material moment.

The stress of weather thus encountered on the 23d continued for some five days before the hold was cleared of the water by the vigorous use of the pumps. Immediately after this experience the captain calked nearly the whole deck, under the forecastle, and at numerous places about the ship, running midship and aft. It appears that thereafter the vessel met with heavy seas and weather, when the deck was flooded constantly, almost, if not quite, as bad as that experienced in the north Atlantic just described; but water was not at any time discovered in the ship after it was relieved thereof from the occurrence of the 23d. It is in evidence that the captain considered it necessary, after leaving Los Angeles, to calk nearly the entire deck, and this to enable the ship to pass survey. Even after the ship arrived in Portland, it was required to replace some of the planking amidship before she was allowed to depart again upon her voyage. The evidence is strong that the water came in in many places through the deck, and, while it is not apparent that much of the cargo near the top was injured, yet it is shown, by the evidences of where the water ran through amidship, that it undoubtedly came in in that way, and that the cause of the damage is attributable to the water pouring through her decks. Manifestly a large amount of water was taken into the hold, because the first tier of barrels of cement was entirely solidified, showing that it had been wet through thoroughly; and a portion of the second tier was injured. The captain is himself of the opinion that the water came through the deck, and there is no testimony that it came in otherwise. It will be understood that the leakage from under the forecastle did not enter the hold, but the water was taken into the fore peak, where no cargo was stored, and bailed out by means of buckets, so that there can be but one conclusion; that is, that the water entered the hold through the main deck, and in great quantities.

The question resolves itself, therefore, into whether due diligence was exercised by the owner of the vessel in rendering her staunch, tight, and in every way fit and suitable to undergo the voyage upon which she was about to enter. This is a burden resting with the owner, as it is a matter conceded that the cargo sustained damages through

the admission of large quantities of water into the ship's hold. The fact appears that the owner made but slight investigation to determine whether or not the deck of the ship was well-calked and safe prior to her leaving port. The only testimony in the record in this regard is that of Capt. Lauro Lauro, who states that he made very little effort to discover the condition of the deck. He applied no tests whatever to ascertain whether it was staunch and secure. He relates that another captain—Maresca—who is a nephew of one of the owners of the ship, made some tests; but they were of cursory character. He simply secured a hammer, and with it tapped around in different places on the deck and upon the inside of the boat, and with a small knife examined the calking. And this was the full extent of any tests applied by the owner or any one in his behalf to determine the sufficiency of the deck to withstand the voyage. It is further in evidence that, after thorough examination of the ship on its arrival in port, no strains or openings were apparent in and about those parts or sections of the ship where it is usual to find them after having passed through heavy or unusual seas. There was but small breakage about the ship, and nothing upon deck was loosened or swept away. These things go a long way in refutation of the testimony of Capt. Lauro touching the severity of the sea and the weather through which he passed.

Considering the age of the ship, as one witness states it, the "original deck should have been all out of her." But, notwithstanding, there has been no attempt to establish whether she had been redecked, or what repairs had been made so as to render her decks substantial and tight. Assuredly due diligence in ascertaining the condition of her decks required that more attention be paid thereto than the evidence indicates there was. But, even if we admit all that has been testified to upon this subject, when the facts just alluded to are taken into consideration, it does not seem to me that the damage was caused through what the law denominates "perils of the sea." The ship was evidently not staunch and tight, as a ship ought to be contemplating a voyage from London around the Horn to this port. It is always to be expected that severe weather may be encountered in the north Atlantic, after leaving London, on the course taken, and, of course, the ship should have anticipated the usual perils incident to such a voyage. The ship Ninfa should have been so repaired as to have enabled her to withstand the kind of weather that she actually encountered. I am convinced, at least, that there was lack of due diligence on the part of her officers and servants in determining whether or not she was seaworthy before she left port. As was said in The Edwin I. Morrison:

"In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate, if loss occurred through their displacement."

And so it is here. Having relied upon their warranty that the ship was seaworthy, and finding that she was unable to withstand the stress of weather, the burden, as has been previously stated, was cast upon the owners to show that they had exercised due diligence before she left port to determine whether or not she was in reality seaworthy as it relates to her deck, which proved insufficient. In this aspect of the case, the respondent has not shown due diligence, or any diligence of

merit to overcome the prima facie case made by the libelants. The Friesland, International Mfg. Co. v. Farr & Bailey Mfg. Co., and The Alvena, supra. I place but slight value on the surveys of the Italian consul and Lloyd's surveyors, made before the ship left London, as their duties do not call for that rigid inspection and the application of known tests for the discovery of fault required of the owner for the determination of whether his vessel is seaworthy.

As it relates to the dunnage of the cargo, there can scarcely be a question that there was negligence on that account. In all probability, had the cargo been properly dunnaged, the damage would not have been nearly so great; possibly there would have been none at all. So I hold, therefore, that the vessel is liable for the damage sustained by the cargo.

I allow libelants damages in amounts as follows:

| | | | | |
|---|---|---|---|---|
| On 1,147 barrels K. B. S. cement, at $2.18 per barrel | | | $2,500 | 46 |
| " 298 " loss by repacking, at $2.50 per barrel | | | 745 | 00 |
| " 538 " reconditioned, decrease in value, at 23½ cents | | | 126 | 43 |
| " 7 " loss by breakage, at $2.50 | | | 17 | 50 |
| Cost of inspection, 1,147 barrels | | | 22 | 94 |
| " " repacking, 872 " at 33 cents (labor) | | | 287 | 76 |
| " " sacks in repacking 538 barrels damaged, 2,152 sacks, at 10 cents | | | 215 | 20 |
| Wharfage and storage on 1,147 barrels, 1 month | | | 57 | 35 |
| On 238 barrels crown cement abandoned, at $2.08 | | | 495 | 04 |
| " 46 " entire loss in reconditioning, at $2.40 | | | 110 | 40 |
| " 232 " reconditioned, decrease in value, at 25 cents | | | 58 | 00 |
| Cost of inspection, 238 barrels at 2 cents | | | 4 | 76 |
| " " repacking, 278 " at 33 cents (labor) | | | 91 | 74 |
| " " 928 sacks used in repacking, at 10 cents | | | 92 | 80 |
| Wharfage and storage on 238 barrels, at 5 cents | | | 11 | 90 |
| On 75 barrels bleaching powder | | | 150 | 00 |
| Extra stevedoring | | | 20 | 07 |
| Aggregating | | | $5,007 | 35 |

—and interest thereon, at the rate of 6 per cent. per annum, from the 27th day of November, 1903.

Judgment will therefore be entered accordingly.